## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**     ) | **Criminal Number:** |
| ) | **1:07-CR-00077-ESH** |
| ) | |
| **vs.**     ) | |
| ) | |
| **MARK S. CROSS,**     ) | |
| ) | |
| **Defendant.**     ) | |
| _____ ) | |

## MEMORANDUM IN AID OF SENTENCING ON BEHALF OF MARK S. CROSS

Defendant Mark Cross, through his counsel, respectfully submits this memorandum in aid of sentencing. The sentencing hearing is scheduled for Friday, August 10, 2007 at 10:00 a.m.

### I
### Introduction

Before the Court is a young man with 31 years life experience who has pleaded guilty to a felony offense. Mr. Cross engaged in the conduct at issue approximately four years ago, when he was 27 years old. It immediately followed his resignation from the first full-time job he held in an otherwise commendable and service-driven life. Mr. Cross's profile, as demonstrated in part from the intimate descriptions that have been submitted to the Court on his behalf, is one highlighted by compassion, generosity, integrity, and dedication for the people and occupations to which he has devoted himself. Like any person, Mr. Cross has taken some detours. None of these, however, have altered the personal qualities that have dominated his lifetime of conduct.

These personal qualities, which Mr. Cross has demonstrated both before and after the conduct on which his conviction rests, in combination with the other factors the Court will consider, show that a sentence of probation is appropriate in this case.

## II
## The Applicable Sentencing Standard

Following *United States v. Booker*, 125 S. Ct. 738 (2005), the Court must impose a sentence in accordance with the factors listed in 18 U.S.C. § 3553(a). *United States v. Pickett*, 475 F.3d 1347, 1353 (D.C. Cir. 2007). The correctly calculated Guidelines range is but one factor for the Court to consider in imposing a sentence. Pursuant to § 3553(a), courts must also consider a number of other factors, including "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed;" "the kinds of sentences available"; the Guidelines; and "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* at § 3553(a)(1), (2), (3), (4), and (6); *see also United States v. Simpson*, 430 F. 3d 1177, 1186 (D.C. Cir. 2005). The *Booker* sentencing framework frees courts to go beyond a mere mechanical application of the Guidelines range.

In this case, the Guidelines factor is not in dispute. The Probation Office calculated the applicable Guidelines range at 0 to 6 months. The parties believe the Probation Office's calculation and analysis of the applicable Guidelines range is correct.

Accordingly, the other sentencing factors set forth in § 3553(a) are the focus of this memorandum. Careful consideration of these factors, particularly in light of the Court's mandate to "impose a sentence sufficient, but not greater than necessary, to

comply with the purposes" of § 3553(a)(2), show that a sentence of probation is appropriate. *See* 18 U.S.C. § 3553(a).

## III
### Factor 1:
### The Nature of the Offense and History and Characteristics of the Defendant

A.    <u>History and Characteristics of the Defendant</u>

Throughout his early adulthood, Mr. Cross has shown himself to be a dedicated and caring individual who makes community and charity his highest priorities. While pursuing and achieving his own educational and career goals, he has consistently focused his attention on helping others. We have received over 30 letters written on behalf of Mark Cross. In the interest of brevity, we have submitted twelve of them to the Court and to the probation officer. *See* Exhibits A-L. These letters, written by friends, neighbors, colleagues, and relatives, bear witness to Mr. Cross's outstanding character and reputation. We respectfully submit that reading these letters will give the Court a better perspective of the human being at issue in this sentencing hearing.

As a young lawyer, Mr. Cross has become a respected member of his law firm, Tindall & Foster, and has already built a productive and successful practice. Within his Houston-based firm, he has volunteered and organized all fundraising efforts following the influx of Louisiana citizens who were fleeing Hurricane Katrina. He volunteered personally at the George R. Brown Facility and the Astrodome where those who sought shelter stayed after the hurricane. He volunteers yearly with his firm's United Way Campaign, and he is the coordinator and organizer of the Race for the Cure for Breast Cancer Team. Mr. Cross continues to speak at several local charities regarding immigration benefits available for hurricane victims and those who are victims of

domestic abuse. Finally, Mr. Cross donates his time and money to his church and other non-profit organizations in Texas, such as the United Way of the Gulf Coast, the Museum of Fine Arts of Houston, Breast Cancer Research organizations, the Multiple Sclerosis 150, and the Human Rights Campaign.

Mr. Cross has not done these things so he will look like a better probation candidate. To the contrary, his entire life history shows he did them because he truly enjoys community service and charity work, and because he has always made it a priority to participate in these kinds of service efforts. Indeed, he did most—if not all—of these things without knowing that criminal charges were even a possibility.

Mr. Cross learned that he was being investigated by the State Department while he was still employed there. Approximately six months after he left, he submitted to a voluntary interview with government agents. In December of 2004, Mr. Cross received an email from the federal agent investigating his conduct, which stated that the investigation was closed in the summer of 2004 without any recommended criminal action. *See* Exhibit M. It was not until August 2006 that Mr. Cross learned—by receiving a target letter from Justice—that his case was far from closed. Mr. Cross spent the 18 months he thought the investigation was over living and acting like he did before and after his employment with the State Department.

His life before the State Department began in the Texas panhandle. Mr. Cross was born on October 24, 1975 in Amarillo, Texas. He grew up in Borger, Texas. Borger is located in the 84th Judicial District where Mark Cross's father served as the District Attorney for approximately 20 years. Mr. Cross has one sister, Michelle.

4

Mr. Cross graduated from Borger High School and attended college at Harding University in Searcy, Arkansas, where he graduated *cum laude* with a degree in Political Science and Spanish.   Mr. Cross was also a competitive classical music vocalist throughout high school and college.  He was state ranked in high school and considered one of the top five baritones in the South while in college.  Mr. Cross attended college at Harding University in Arkansas on an academic and music performance scholarship.

Mr. Cross was always well above-average in his course work and substantially involved in activities outside of school.  He was elected president of his senior class at Harding University.  He spent two spring breaks during college doing volunteer work for inner-city churches in Little Rock, Arkansas and Boston, Massachusetts.  He spent a summer during college in Venezuela working to help the indigent.

After college, Mr. Cross obtained his law degree in 2001 from the University of Houston Law Center in Houston, Texas.  While attending law school at the University of Houston, he formed the Christian Legal Society, started a Habitat for Humanity branch, taught middle school children at the Sylvan Learning Center, and was actively involved in the Race for the Cure.

**B.**    **The Nature of the Offense**

The offense of conviction is based upon Mr. Cross's use of his government-issued diplomatic passport for personal travel.  We do not challenge his conviction for this offense or the seriousness of the charge.  We do, however, seek to provide some context.

It is undisputed that Mr. Cross's conduct caused no loss or damage to any individual and did not result in him being enriched in any way.  Mr. Cross has shown no propensity to commit similar crimes at any point in his background and, in his new

capacity as a private immigration lawyer, there is no reason to believe he will ever be in a position to exercise similar poor judgment in the future. His conduct involved neither violence nor disregard for human life or safety. Mr. Cross received no pecuniary benefit or gain in return for his actions.

The investigation that led to the instant charge against Mr. Cross stemmed from earlier, extraneous conduct while working for the State Department that the court may find relevant. This conduct involved the issuance of non-immigrant visas by Mr. Cross while he was employed as a consular officer in Caracas, Venezuela.

Mr. Cross began his short career with the State Department in September 2001. After several months of training in Washington, D.C., Mr. Cross was assigned to work as a Consular Officer in Caracas, Venezuela in June of 2002. This was his first position with the State Department and his first full-time job since graduating from law school. Beginning the first week of his position at the U.S. Embassy in Caracas, Mr. Cross started interviewing applicants for visas. Because Venezuela was going through a very difficult time socially, economically and politically, a vast number of Venezuelans applied for work and tourist visas. Mr. Cross conducted the visa interviews, questioned the applicants on their proposed travel to the United States, checked the computer database for possible security clearance issues, and either approved or denied the visas. Over a period of 15 months working in the Consulate, Mr. Cross adjudicated over 22,000 visas. On average, he adjudicated 100 visas every morning.

Mr. Cross was repeatedly commended for his work ethic. In written evaluations, his achievements were described as "remarkable and outstanding." *See* Exhibit N. His supervisor also stated that Mr. Cross was "performing admirably," was "a dedicated team

member," and was "tremendously talented." *See* Exhibit N.  Mr. Cross was also commended for exhibiting a "professional, but sympathetic demeanor" by eliciting "the whole story from [visa] applicants, so that he could consider all the relevant information in deciding their cases." *See* Exhibit N.  Mr. Cross was also praised for uncovering a "huge alien smuggling ring based in Caracas" that involved "moving Ecuadorian children to uncertain fate in the United States." *See* Exhibit N.  For this, Mr. Cross was recognized by the Assistant Secretary of State for Consular Affairs and described as "one of the highest achievers in a field of high achievers." *See* Exhibit N.

As the "Statement of Offense" accurately reflects, however, Mr. Cross intermittently missed information on background checks that should have been caught and reviewed under the State Department's procedures.  Although Mr. Cross's superiors recognized that he handled far more visa cases than any other employee and described his productivity as combining "extraordinary quantity with outstanding quality," they also cited him for making several significant visa application errors.  These errors, which were described as "sloppy" and in "poor judgment," were brought to his attention at the time.  *See* Exhibit O.  Mr. Cross offered no excuses, and "realized the gravity of these oversights and expressed concern for the potential consequences to U.S. security."  *See* Exhibit O.  Mr. Cross made these errors in approximately forty-one separate cases, out of the 22,000 cases he processed during his time as a Foreign Service Officer.

During this time, Mr. Cross was also reprimanded for issuing a non-immigrant visa to a personal acquaintance.  Mr. Cross offers no excuses for this behavior other than to say he was trying to help a friend who said he needed immediate entry into the United States for a family emergency.  At the time this occurred, Mr. Cross was the Consular

7

Officer designated to review all emergency visa requests. He received his friend's visa application while he was having dinner with friends and offered to process it personally. His friend initially wanted to apply for a tourist visa to visit his sister, but he later informed him that it was actually a medical emergency.

During his review of the application, Mr. Cross saw no indication of anything that would have barred his friend from getting a non-immigrant visa for an emergency visit or for a standard tourism visit. Nevertheless, he fully concedes that he should have referred his friend to another consular employee in accordance with protocols.

After the visa was issued, the Consul General questioned Mr. Cross about the emergency issuance, in part because Mr. Cross's friend had told him that he initially planned to travel for tourist purposes rather than an emergency trip. The Consul General reminded Mr. Cross to make personal notes on visa applications, as was customary, to help clarify any discrepancies between the application and the visa ultimately issued by the State Department. It was very common for all Consular Officers to make notes on the visa applications themselves as well as in the computer database. After discussing the case with the Consul General, Mr. Cross made notes clarifying that the application was for an emergency family medical visit and that the applicant needed to travel immediately. Mr. Cross had no intent to misrepresent his friend's situation and he was forthcoming with supervisors and diplomatic security investigators when questioned about the incident. In accordance with his understanding of the Consul General's instructions, he merely added clarification to the computer database as well as personal notes to the physical application. Nothing was ever altered or erased from the original visa application.

After being counseled by his supervisor (the Acting-Consul General) Mr. Cross was relieved of all consular duties, including all background checks. He resigned a short time later and subsequently engaged in the offense of conviction, as Mr. Cross used his passport for personal travel shortly after resigning from the State Department.

Mr. Cross's undoubtedly showed extremely poor judgment in issuing non-immigrant visas without following State Department procedures, both when he failed to adequately conduct background checks and when he issued an emergency visa for a friend. As with the offense of conviction, however, this conduct resulted in no loss or damage to any individual or to the community or the United States. Mr. Cross received no pecuniary benefit for issuing these visas and was in no way enriched by his conduct.

## IV
## Factor 2:
## The Purpose of Sentencing

**A.**    **Reflect Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment**

Even after Mr. Cross was informed that the investigation was closed in 2004, he continued on a steady course of gainful employment, community involvement, and charitable activity. As a man who has consistently worked to better himself and help others in his sphere of influence, Mr. Cross spent the 18 months following his notice that the investigation was closed exhibiting the "highest ethical professional standards" in the practice of law to both his employer and fellow attorneys. *See* Exhibits A and B. Mr. Cross has amply demonstrated a continuing respect for the rule of law and also that he is a superb candidate for complete rehabilitation.

**B.    Deterrence**

Mr. Cross was relieved of all consular duties at the embassy in Venezuela and has left the State Department. To the extent he was enabled by his position to commit the conduct of conviction, his resignation from the State Department has accomplished absolute specific deterrence. In his private law practice he is completely relieved of any opportunity to make similar mistakes. In fact, it is now his express responsibility to help people with their immigration problems within the bounds of the law. He is no longer in possession of a diplomatic passport and has not been in possession of one since 2004. He has also agreed in his plea agreement not to seek re-employment with the United States. Thus, he is absolutely deterred from committing the offense of using a diplomatic passport for personal travel.

As the attached letters demonstrate, Mr. Cross has expressed disappointment in himself and remorse about his conduct to personal friends and acquaintances, and has shown an awareness of the consequences of a felony conviction separate and apart from formal punishment. Mr. Cross has expressed sadness about the loss of his voting privileges and the shame of carrying a felony conviction. He has taken it upon himself to voluntarily report his conviction to the State Bar of Texas. In short, the investigation and the resulting conviction have been enough to deter Mr. Cross from any further criminal activity. Prison time will not serve as any additional specific deterrence in this case.

Additionally, the general deterrent value of Mr. Cross's prosecution is manifest in the very public way he has chosen to share information about his conviction. He has informed his family, his employer, other attorneys who practice immigration law, the State Bar of Texas, and his friends. He also knows that his case – like others prosecuted

by the Public Integrity Section of the Department of Justice – will be reported to Congress and available on the internet for any who care look and read.

**C.**    **Protect the Public from Further Crimes**

Mr. Cross has demonstrated that he is a productive member of society. Nothing in his background suggests that he will pose a risk to the public or will engage in any further illegal conduct. By his plea and acceptance of responsibility, he has assumed the ignominy that follows a felony conviction. That distinction alone, regardless of any sentence the court may impose, will ensure that Mr. Cross lives a law-abiding life.

**D.**    **Provide Training or Other Correctional Treatment**

Mr. Cross has completed one advanced degree beyond his college education and is fluent in a foreign language. He is currently employed as an attorney in private practice. Even if Mr. Cross is not allowed to continue working in his chosen occupation, there is no reason to believe he could not exercise the same kind of self-help he used to become a lawyer in choosing a different way to make a living. Incarceration will not expand his opportunities in this regard. Any additional supervision the Court may wish to provide Mr. Cross can be accomplished as a condition of any probated sentence.

**V**
**Factor 3:**
**The Kinds of Sentences Available**

As disclosed in the Presentence Investigation Report, Mr. Cross is eligible for probation according to the Federal Sentencing Guidelines because the applicable guideline range is in *Zone A* of the Sentencing Table. *See* U.S.S.G. §5B1.1(a)(1).

**VI**
**Factor 6:**
**Avoiding Disparity in Treatment of Similar Offenders**

We have searched the public reports sent to Congress by the Public Integrity Section of the Depart of Justice and have been unable to identify an example of a prosecution against an individual for traveling in violation of the conditions or restrictions of a diplomatic passport.[1] We have, however, identified two prosecutions of individuals whose conduct had a direct impact on the integrity of consular functions.

Unlike offenders in other cases, Mr. Cross received no pecuniary benefit or gain for the irregular issuance of non-immigrant visas or the use of his diplomatic passport for personal travel. In contrast, Patricia Raikes, a former State Department Chief Consular Officer, pleaded guilty in 2005 to conduct involving the issuance of visas. *See Report to Congress on the Activities and Operations of the Public Integrity Section For 2005.* Ms. Raikes issued or approved more than 35 visa applications submitted by foreign business-persons who were ineligible to receive the visas. *Id.* She received thousands of dollars in benefits from these people in the form of paid airline travel and hotel stays for herself and her family members. She was sentenced to one year of probation and a $3000 fine. *Id.*

Alden P. Stallings, another offender in a similar case, was sentenced in 2004 to one year of probation, 100 hours of community service, and a $5,000 fine. *See Report to Congress on the Activities and Operations of the Public Integrity Section For 2004.* Stallings submitted 54 referrals to the Consular Section of the Embassy in Seoul for applicants for non-immigrant visas to the United States. *Id.* He provided false

---

[1] We have identified only one reported case, *United States v. Johnson,* 735 F.2d 373 (9th Cir. 1984), concerning the misuse of a diplomatic passport. In *Johnson,* the defendant was convicted of importing narcotics and misuse of a passport. The opinion in *Johnson* does not clearly address the conduct for which the defendant was convicted or the punishment the defendant received and, thus, provides no guidance.

information in the referrals about his relationship with the applicants. *Id.* In particular, he claimed he personally knew the applicants when, in fact, he did not know them. *Id.*

Both the Raikes and Stallings cases involved conduct that was aimed at intentionally circumventing consular rules and regulations–the Raikes case by a consular official and the Stallings case by a private citizen. Each of these persons engaged in intentionally deceptive conduct related to the issuance of non-immigrant visas in exchange for personal enrichment. Each person received a probated sentence. The treatment of these similar, but distinctly more egregious acts, favors a probated sentence for Mr. Cross.

## VII
### Conclusion

We respectfully submit that, based on the totality of the circumstances and the factors outlined in section 3553(a), a fully probationary sentence would be fair, just, and appropriate.

Respectfully submitted,

_____/s/_____
Philip T. Inglima (D.C. Bar # 420119)
Stephen M. Byers (D.C. Bar #442853)
Crowell & Moring LLP
1001 Pennsylvania, N.W.
Washington, D.C. 20004-2595
Telephone: (202) 624-2500
Facsimile: (202) 628-5116

Dated: August 7, 2007

OF COUNSEL:

Andy Drumheller*
Southern District of Texas I.D. No. 22734
State Bar of Texas No. 00793642
Derek S. Hollingsworth*
Southern District of Texas I.D. No. 34569
State Bar of Texas No. 24002305
RUSTY HARDIN & ASSOCIATES, P.C.
5 Houston Center
1401 McKinney, Suite 2250
Houston, Texas  77010-4035
(713) 652-9000
(713) 652-9800 (fax)
*Admitted to the District of Columbia Bar *pro hac vice* on April 13, 2007

CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of August, 2007, a true and correct copy of the foregoing Memorandum in Aid of Sentencing on Behalf of Mark S. Cross was served by facsimile transmission and sent via overnight delivery to:

Peter M. Koski
Chief, Public Integrity Section
United States Department of Justice
1400 New York Avenue, NW, 12th Floor
Washington, D.C. 20005
(202) 514-3003

_____/s/_____
Philip T. Inglima

# EXHIBIT A

HARRY L. TINDALL*
CHARLES C. FOSTER**
ROBERT F. LOUGHRAN**
ANGELA O. PENCE*
MAGALI S. CANDLER**
KAREN KATZ FELDMAN**
ANGELIQUE MONTANO**
H. RICHARD SINDELAR III†
MATTHEW G. THOMPSON
KRISTEN T. BURKE
DELISA J. FUTCH
J. JAY STRIMEL
CORINA M. FARIAS
MAGGIE MURPHY
JARRED J. SLATER
MARK S. CROSS
RYAN C. CHARGOIS
JAY K. AJYER†
SUSAN L. BRADY
RACHEL D. LITTLE

KAREN HUNTER-COURRÈGES
‡FAYE M. KOLLY
ASHIMA DUGGAL
◊DOROTHEE B. MITCHELL
BENJAMIN J. SCHATZ
† KEVIN R. LASHUS
NAZNEEN JAFFERI
PAUL J. ZAMBIE

BOARD CERTIFIED·TEXAS BOARD
OF LEGAL SPECIALIZATION:
*FAMILY LAW
**IMMIGRATION & NATIONALITY LAW

†OF COUNSEL

‡LICENSED IN THE STATE OF MISSOURI
◊LICENSED IN THE STATE OF CALIFORNIA

✦H. SUSAN SONG
✦MEMBER OF THE CANADIAN SOCIETY OF
IMMIGRATION CONSULTANTS
(NOT LICENSED IN THE U.S.)

# TINDALL & FOSTER, P.C.

ATTORNEYS AT LAW
600 TRAVIS STREET, SUITE 2800
HOUSTON, TEXAS 77002-3094
TELEPHONE: (713) 229-8733
FAX: (713) 228-1303
www.tindallfoster.com

June 25, 2007

The Honorable Ellen Segal Huvelle
U.S. District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re:   Mark S. Cross

Dear Judge Huvelle:

As the President of Tindall & Foster, P.C., I am very pleased to write this letter on behalf of Mark Cross who has practiced immigration law with Tindall & Foster, P.C., a law firm that primarily specializes in employment sponsored U. S. immigration in the representation of large U. S. employers in connection with the qualification of a small percentage of their highly skilled work force.

Mark Cross has been employed as a full licensed attorney with our law firm since June 2, 2005 and has an outstanding record. Very few attorneys have had such a favorable impact on our law firm in such a short period of time as has Mark. He has shown great sensitivity in representing our clients in a highly ethical professional manner in terms of both employers and foreign nationals who may seek to qualify under our complex immigration law system. During his two years of employment here, Mark has gone beyond the expected duties of an attorney and coordinated a firm-wide Race for the Cure for Breast Cancer team and fundraiser and volunteered in a successful United Way campaign at our firm.

I am fully aware of the felony charge against Mark regarding the use of his diplomatic passport and that he has taken responsibility for his past action and I know how upsetting this has been to Mark and that something like this was not intentional. All I can say is that any illegal or questionable conduct by Mark while employed at the U.S. Embassy in Caracas is clearly an aberration from his character and it is hard for me to believe that it was based on some knowing intentional act, but more an unfortunate product of the volume of cases under his responsibility.

I am also aware that Mark has already decided to self-report these actions to the Disciplinary Board for the Texas Bar. Although this is not a requirement under the rules of the Texas Bar, this is yet another example of how Mark is taking full responsibility for his past actions. A favorable decision from the Disciplinary Board and a fully probated sentence from the District Court would allow Mark to continue to do very important legal work in our community to ensure that corporate employers and their prospective foreign national employees are able to navigate successfully, legally, and ethically through a complex legal system.

In every instance I have known Mark he has exhibited the highest ethical professional standards and I have every reason to believe that Mark would not do anything now or in the future that would discredit such record. Over the years I have hired many attorneys and Mark would be at the top of the list in terms of how seriously he takes his work and his professional conduct.

The work that Mark does is extraordinarily important not only to our legal profession, but to our society. Very few attorneys have the opportunity to make such an important lasting mark of contributing to the modern American dream; to assist employers and particularly foreign nationals to navigate through a complex legal system that would allow them to be legally employed in the U. S. and in many cases to eventually seek Lawful Permanent Residency or so-called "green card" status and eventual citizenship not only for themselves, but for their children. This involves not only the ability to understand the legal and regulatory systems, but to have a great appreciation culturally and otherwise for the concerns of the foreign nationals as they go through the lengthy and often frustrating process that literally determines their future.

In short, in my experience with Mark, he has made and will continue to make a significant contribution in the legal field and the clients that we represent. I would be pleased to provide additional information at any time in any way to assist Mark Cross.

Sincerely yours,

Charles C. Foster

CCF:jr

# EXHIBIT B



QUAN, BURDETTE & PEREZ

5177 Richmond Avenue, Suite 800
Houston, TX 77056

Tel: 713.625.9200
Fax: 713.625.9292
www.quanlaw.com

June 29, 2007

The Honorable Ellen Segal Huvelle
U.S. District Court for the District of Colombia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

RE: Mr. Mark Cross

Your Honor:

I write this letter on behalf of Mr. Mark Cross - a dear friend and colleague within the legal profession. Since I have known Mark, I have come to realize who he is as a professional, a friend and human being. It is through this letter, and the letters of others, that I hope you will attain a better understanding of who Mark is as a person, how he is fully aware of the crime he committed, how these events have severely impacted his life, and how he fully accepts responsibility for his actions.

Mark and I both practice U.S. Immigration Law in Houston, Texas, for the two largest immigration firms in the state. As such, attorneys from these "competing" firms tend to deal a lot with each other. As our practices are very similar, Mark and I developed a close friendship that stemmed from our interactions as lawyers. We tend to call on each other for "outside" opinions, or just to converse about interoffice politics. As an attorney, I know Mark to be of the highest caliber. Not only is he respected throughout his firm, but he has earned the admiration and respect of his peers outside his law firm's doors. Through our respective practices, Mark and I deal quite frequently with similar agencies and personnel within the U.S. Government – they too have the same admiration and respect for Mark.

I am fully aware that Mark has been charged and pled guilty to a felony offense. Mark and I have discussed his situation at great length, and every conversation concludes with Mark saying he understands why he is going through this unfortunate ordeal and that he accepts the consequences of his actions. I cannot stress to Your Honor enough how proud I am of Mark. It takes great character, strength and faith for any human being to take responsibility for their actions. As an observer these past few months, I have seen Mark help those around him understand his circumstances more. It is Mark's friends and family that are having a difficult time seeing him take responsibility and constantly questioning the reason for, what some may call, a random charge. But not Mark, he has always tried to convey to those that know of his plight, that this is what he must go through, and that he fully accepts it.

For as long as I have known him, Mark has always been a stable, level-headed individual who's path runs similar to mine – family, faith, friends and work. These past months, I have seen Mark appreciate and cherish each facet of his life more than ever. I can see how he appreciates everything that is bestowed upon him – positive or negative. His ties to his family have grown even stronger, his faith has blossomed and the friendships he holds have become deeper in meaning.

---

HOUSTON    |    SAN ANTONIO    |    RIO GRANDE VALLEY    |    MEXICO CITY

All that being said, there has always been that constant state of sadness in Mark – it is the fear and apprehension of the unknown. Although Mark understands what and why he must go through this chain of events, it is the uncertainty of the outcome that is most disheartening to see him go through. For instance, Mark and I are close in age. As such, I just finished purchasing my first home. Mark does not know if and when he will be able to purchase his first home due to his unfortunate circumstances. Additionally, I have elevated to a Senior Associate position in my firm; whereas Mark does not yet know how the instant outcome will affect his ability to practice law. The inability for him to vote has also affected him. I can almost guarantee that most individuals before Your Honor are not that concerned with their civic duty. Mark and I have had heartfelt conversations at length regarding the aforementioned aspects of our individual lives and I have seen the uncertainty in his take its toll. Although, he is usually able to bring himself out of the sadness, one cannot help but see the effects.

For some of the reasons I mention above, the conduct which was the catalyst for Mark be present before Your Honor is not in line with the friend and colleague I know. As an attorney, Mark has always been aware and acute of his actions and the actions of others. We advise clients on a daily basis what documents are necessary to travel to and from the United States, in addition to assisting clients to legally work and reside in the U.S. so it is with the utmost confidence that I see Mark's conduct in this case to be a complete departure of character.

There is a plethora of reasons I can think of to justify Mark receiving a fully probated sentence from Your Honor. Not only for the reasons discussed above, but for others as well. Mark organized his firm's team for the Susan G. Komen Breast Cancer Run/Walk last year, he participated in the Annual Houston Dragonboat Race to celebrate Asian Heritage Month, and he donates monies to various national and local charities. These actions are more than most individuals do in a lifetime. Mark's community not only needs him, but it wants him.

I ask that Your Honor take all these reasons into account when making your judgment regarding punishment. And I hope that Your Honor finds it sensible and just to grant Mark Cross a fully probated sentence. The man in front of you is not like most. He is a decent, caring, and respected individual who takes full responsibility for his actions. He is also my friend.

Respectfully submitted,

Roberto D. Caballero, Esq.

# EXHIBIT C

# County of Hutchinson
### State of Texas



### *Michael D. Milner*
#### County Attorney

Telephone (806) 273-0134
Fax (806) 273-0123

1400 Veta, Suite 108
Borger, Texas 79008

June 15, 2007

Hon. Ellen Segal Huvelle
U.S. District Court for the District of Columbia
333 Constitution Ave., N.W.
Washington D.C. 20001

Re:     Mark Cross

Dear Judge Huvelle:

My name is Michael D. Milner and I currently serve as County Attorney of Hutchinson County, Texas. I am submitting this letter to you on behalf of Mark Cross for your consideration at his sentencing on August 10, 2007.

I have had the pleasure of personally knowing Mark and his family since 1983, when I began working for Mark's father, Stephen F. Cross, who was then serving as District Attorney of the 84th Judicial District of Hutchinson County, Texas. Mark's father had a distinguished career as a prosecutor, is currently practicing law in Hutchinson County, and is very highly respected by his peers and the community in general.

Mark was seven years old when I first met him and I've watched him grow into a very pleasant, courteous, and conscientious young man. Mark was raised in a very loving and nurturing home. He had always been an exceptional student, involved in many school-related activities, and was as good of a role model for other students as any high school student I've known. During all these years, I have never known Mark to be anything but an honest, trustworthy, law abiding person and had felt that he exemplified the high moral character, work ethic, and integrity that parents seek to instill in their children. I've never known Mark to give his parents an ounce of worry or to have any trouble in school. He was, and is, as good a son as anyone could wish for. I believe Mark's ambition to become a lawyer, and his becoming a successful attorney, was a direct result of his respect and admiration of his own father, his father's work as a prosecutor, and the ethics his father displayed in performing such work.

I am aware that Mark has been charged with the offense of Misuse of a Diplomatic Passport and that he has pled guilty to this offense. Certainly I was shocked to learn that Mark had committed this offense as this is simply out of character for Mark. Of all the kids I've seen grow up here in Borger and move off to begin their careers, Mark would have been one of the last ones I'd ever expect to get into to any trouble or to do anything contrary to the law. Mark had always been one of those individuals who set definitive goals for himself and who took as much pride in the manner in which he achieved his goals as he did in obtaining them. I truly believe that Mark simply was not thinking about the seriousness or any consequences of using his diplomatic passport at the time. Nevertheless, my opinion that Mark is an honest, trustworthy, and law abiding person remains very strong.

As a prosecutor I also must make decisions with respect to whether to pursue a jail sentence against a defendant or to offer a probated sentence. I feel that Mark is not only a good candidate for probation but is a perfect example of someone who is deserving of a fully probated sentence. It's my understanding that Mark derived no financial gain from having committed this offense and that he has accepted responsibility for what he's done. I believe that this was a one-time mistake and that he's truly remorseful. I also believe that he's not someone who needs to be rehabilitated or punished by serving any amount of time incarcerated nor do I believe society would gain any benefit from his incarceration. Knowing Mark and his upbringing as well as I do, I have no doubt that the embarrassment, shame, and humiliation Mark is experiencing in having been charged with this offense and having to face his parents, relatives, and friends, will serve to punish Mark for years to come.

It is in this regard that I respectfully ask that you consider allowing Mark the benefit of a fully probated sentence. Thank you for your time and consideration to this matter and for giving me an opportunity to share this with you.

Very truly yours,

Michael D. Milner
County Attorney
Hutchinson County, Texas

mdm/MM

# EXHIBIT D

June 28, 2007

The Honorable Ellen Segal Huvelle
U. S. District Court of the District of Columbia
333 Constitution Avenue, NW
Washington, DC  20001

Dear Judge Huvelle,

On behalf of my good friend, Mark Cross, I write this letter to let you know more about him so that you may make the most appropriate decision regarding his sentence.

I have known Mark for the past thirteen years since he and I were freshmen at Harding University.  Throughout that time, Mark has become one of a few people that I can call a life-long friend.  He was Best Man in my wedding three years ago.  We were members of the same men's service club in college where we served as officers together.  Following graduation from Harding, Mark attended the University of Houston to pursue his law degree.  I too went to the University of Houston for my Master of Social Work degree.  When I decided to move to Houston for graduate school, I gladly chose to be Mark's roommate.  He and I lived together for a full year before I graduated and moved back to west Texas.

I am fully aware of Mark's felony offense for which he pled guilty on April 16, 2007.  Obviously, Mark would benefit from a fully probated sentence.  However, based on knowing Mark as well as I do and having seen his thoughtful acts of kindness over the past thirteen years, I know others with whom Mark encounters will benefit from that sentence as well.  I have always been proud of the level of concern he has for others and for the action he takes to impact all kinds of people.  A few things of which I am aware Mark has done for the benefit of others are: leading a group on a Habitat for Humanity project, mentoring young people as a tutor and substitute teacher, sending notes of encouragement and support and taking homeless individuals to get a meal.  Though I have no proof of this next statement, I have long suspected that several anonymous acts of generosity that I have witnessed among mutual friends and acquaintances can be attributed to Mark's actions.

Mark and I have maintained regular contact during the past thirteen years.  We have especially grown closer during difficult times.  From death and several major illnesses in our families, we have always kept close to provide support to one another.  However, having seen Mark go though many of these events in life, I attest to the fact that I have never seen him as devastated as I have seen him during the events of these past months.  I know that Mark understands the consequences of his actions and takes full responsibility for those mistakes.  It has been very difficult for me to see him realize the severity of his offense and its impact on his life from this point forward.

Again, I sincerely appreciate the opportunity I have been given to convey my thoughts to you to hopefully positively impact your decisions while sentencing Mark.  In my humble opinion, I believe that Mark has already completely realized the impact of his actions and that he and others associated with him will be sufficiently impacted by a fully probated sentence.  Thank you for your consideration.

Sincerely & Respectfully,

Kirk Workman
2644 Hartman Street, #4107
Dallas, Texas 75204

# EXHIBIT E

JUL - 2 2007

June 28, 2007

The Honorable Ellen Segal Huvelle
U.S. District Court for the District of Columbia
333 Constitution Ave. N.W.
Washington, D.C. 20001

Dear The Honorable Ellen Segal Huvelle,

I met Mark Cross in 1994 while we were in our freshman year at Harding University. During the four years we were in school together Mark and I had many classes together, were in several student organizations together, had the same group of friends, and I even spent a Thanksgiving holiday with his family when I was not able to fly home. Mark and I have remained good friends to this day.

I am aware that Mark has been charged with a felony offense and that he has accepted responsibility for his conduct in committing that offense. I know that he has been distraught over his actions and it has devastated him greatly. He is truly sorry for the crime that he has committed and his conduct in this offense is in no way consistent with the type of person that I know Mark to be. I feel that allowing Mark to receive a fully probated sentence would benefit more than just himself; it would benefit those who he comes into contact to every day. Mark is an individual who strives to do what is right and to make the world around him a better place. He is a man that has a very strong moral compass and stands strong to his convictions. In the 13 years that I have known Mark I have known him to be an honest, hard working, and all around good human being. He genuinely cares for others and strives to do what is right as he goes through life. He makes a positive contribution to the community and those around him.

Sincerely,

Amy Cox McCown

Amy Cox McCown

10545 LAKEMERE DRIVE
DALLAS, TEXAS 75238

EXHIBIT F



# U N I V E R S I T Y  *of*  H O U S T O N

LAW CENTER
CLINICAL LEGAL EDUCATION

June 18, 2007

PETER HOFFMAN
*Director*
*Blakely Advocacy Institute*

THOMAS NEWHOUSE
*Professor of Law*
*Mediation Clinic*

JANET HEPPARD
*Associate Clinical Professor*
*Civil Clinic*

JOSEPH A. VAIL
*Associate Clinical Professor*
*Immigration Clinic*

DON TOMLINSON
*Clinical Professor*
*Transactional Clinic*

KRISTINA VAN ARSDEL
*Assistant Clinical Professor*
*External Placements*

GAIL LUTZ
*Supervisory Attorney*
*Juvenile Clinics*

RICHARD McELVANEY
*Supervising Attorney*
*Consumer Law Clinic*

DIANA VALARDO
*Clinical Supervising Attorney*
*Crime Victims Coordinator*
*Immigration Clinic*

JENNY MOYA
*Clinical Supervising Attorney*
*Immigration Clinic*

ANNE CHANDLER
*Clinical Supervising Attorney*
*Immigration Clinic*

TOM PERKINSON
*Clinical Supervising Attorney*
*Immigration Clinic*

MARILYN COOPER
*Program Manager*

THELMA BAINES
*Legal Secretary*

LAURA SANMIGUEL
*Secretary*

Honorable Ellen Segal Huvelle
United States District Court
For the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C.

Re:  Mark Cross

Dear Judge Huvelle:

I am writing this letter of recommendation on behalf of Mark Cross.  I first met Mark in August of 2000.  Mark enrolled in the immigration clinic which I direct at the University of Houston Law Center.  He later also enrolled in an immigration law course which I taught here at the law school.  I have been in contact with Mark since he graduated from the Law Center, especially in the last several years when he has been employed at the Law Offices of Tindall & Foster in Houston Texas.

I am aware that he has been charged with a felony offense, and that he has accepted responsibility for his conduct in committing the offense.  I know Mark well and I know that he feels sad and ashamed for this offense.  I believe that this is a one time event, that Mark will not be involved in any unlawful activity in the future.  I say this for the following reasons.  During the time that I worked with Mark I found him to be an extremely honest and hard working individual.  He represented indigent refugees and immigrants from around the world, some of whom were seeking asylum in the United States.  Mark was an extremely hard worker who cared deeply about those who were less fortunate than him.  He was very well respected by his fellow students and by the faculty in the clinic.

One example of Mark's character involves a young Colombian woman who came to the clinic seeking representation.  Her life had been threatened in Columbia by guerrilla forces.  She had to flee the country with her young son to find protection in the United States.  She was indigent and came to the clinic.  I assigned the case to Mr. Cross and he devoted himself whole-heartedly to the case.  He went above and beyond the call of duty in representing this young woman and her son.

In summary, I know Mark Cross to be an ethical, hard working, and caring individual.  I am certain that allowing Mark to receive a probated sentence would

be the best not only for Mark but also for the community.  He has a lot to give.  I do not believe that he will make the same mistake again in the future.  If you have any questions please do not hesitate to contact me at 713 743-2094.  Thank you.

Respectfully submitted,

Joseph A. Vail
Associate Clinical Professor
University of Houston Law Center
Clinical Program

# EXHIBIT G

Michael Walsh
1801 Huldy Street, Apt. 13
Houston, Texas 77019
June 27, 2007

The Honorable Ellen Segal Huvelle
U.S. District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington DC 20001

Dear Judge Huvelle:

I am writing to you on behalf of my dear friend Mark Cross. It is my understanding that
Mark has been charged with a felony offense for misusing his U.S. State Department
issued passport for personal travel. I am also aware that Mark has accepted responsibility
for his conduct in committing that offense. It is my intention that this letter show you the
amiable and genuine facets of Mark's character as a person and friend, that you may
better perceive him as he is known by myself and those that care for him as a generous
and thoughtful friend.

I first met Mark Cross during the autumn of 2001 while pursuing my graduate studies at
Rice University. We were introduced to each other at a party by Kade Smith, a newly
acquired friend and also Mark's former roommate. Mark and I became friends and kept
loosely in touch while he was away in Venezuela. After his return to the States, Mark
and I forged a closer friendship, which we have maintained over the years. What strikes
me most about Mark is his kindness and charisma. After graduating from Rice, Mark
very generously donated me an old bed he was going to give away, along with some
furniture pieces. Since then, I've been the lucky recipient of loads of clothing and CDs
Mark has passed my way. Most of my friend group here in Houston is directly attributed
to connections made by Mark. As a friend, Mark is thoughtful, loyal, and reliable. Last
June, in the summer heat of Houston, Mark alone helped me move my entire apartment,
as most of my close friends were unable to do so. He is always smiling, loves sharing a
good laugh, and is very passionate about his work and the music he loves. His joy for life
is contagious.

I have noticed a shift in Mark's disposition since the issues regarding this matter began to
arise. I think the stress and concern of the situation has had a profound effect on him. I
know Mark is very anxious about the resolution to this situation; I can see the seriousness
and distress in his eyes. Knowing Mark as closely and for as long as I have, it is out of his
normal character that he would willfully misuse his passport and deliberately break the
law. Knowing that he has pled guilty to this crime shocked me, but it also showed me

what integrity Mark had in knowing he had chosen poorly. He admitted to his wrong and is willing to take full responsibility for it. I have seen how damaging this confession has been on Mark's pride and conscience, yet I am proud he had the decency and good character to do so.

I believe that a fully probated sentence would be the best resolution to this matter. Mark is remorseful and is completely aware of the possible consequences of his actions. I can see firsthand how it has embarrassed and devastated his life. I think a fully probated sentence would benefit more than just Mark's interests. He is deeply committed to and invested in his friends, work, and the Houston metropolitan community; the absence of his presence would leave a great void. Thank you for your time and careful consideration in this very important proceeding. I hope my insights into Mark's personality have given you a better understanding of how considerate and dependable he is as a person and friend. I do not believe Mark's actions should plague him for the rest of his life. I know he would do anything in his power to rectify the situation. He is a vibrant soul, and I truly believe his talents and skills are vastly needed in the greater Houston area.

Sincerely,

Michael Walsh

# EXHIBIT H

4104 Garrott, #1
Houston, TX 77006
June 21, 2007

Honorable Ellen Segal Huvelle
U.S. District Court for the District of Columbia
333 Constitution Ave. NW
Washington, DC 20001

Dear Honorable Huvelle,

I am writing this letter on behalf of Mark Cross. I am aware that Mark has committed a felony and is taking full responsibility for his action. I was traveling with Mark when he used his diplomatic passport for personal travel. We did not receive any special treatment or special benefits because of the diplomatic passport, and I know he is deeply upset and regretful for his action.

I met Mark 9 years ago at church. Since I've known Mark, he has always been an outstanding, caring, compassionate person and an asset to the community. While most college students spend their spring and summer breaks on the beach, Mark spent most of his time off doing humanitarian work. Mark spent one spring break in Little Rock, AR volunteering at a homeless shelter, and helping to create and facilitate a carnival for inner city kids. Mark spent another spring break in New Hampshire building a church and serving meals to homeless.

Mark spent the entire summer after his junior year in college in Maracay, Venezuela. There, he helped build homes for the less fortunate of Venezuela and donated supplies of clothes and shoes from his own closet. In his off time of building homes, Mark used his fluency in Spanish to teach children how to read. So touched by the experience in Venezuela, Mark ended up leaving everything he brought and coming home with empty suitcases. He even left his personal "nice, expensive" clothes.

While in law school Mark founded the Christian Legal Society (CLS), a group formed to serve the community. As the founder and president of CLS, he organized a Habitat for Humanity project every year. He also coordinated a volunteer ministry effort for inmates in Texas prisons.

Mark has consistently contributed his time and money to various charity organizations including: Race for the Cure, Breast Cancer Research, United Way Campaign, Houston Interfaith Ministries, The Salvation Army, Lakewood Church, and The Impact Church. Last August, Mark took Houston inner city children back to school shopping for school uniforms. He also coordinated a clothing drive and fund raiser for victims of Hurricane Katrina. Mark's deep sympathy and

commitment for those suffering in our world has enabled him to make a difference in people's lives.

Mark is also passionate about breast cancer awareness. He lost his grandmother to breast cancer in 1999, and Mark's mother is a breast cancer survivor. Mark coordinated a team of runners and walkers for the Race for the Cure in 2006. Mark enlisted his law firm and got the firm to match dollar for dollar what the team members raised. Last year the team and the law firm donated $8,000. This was the first time Mark's law firm had ever participated in the Race for the Cure. Mark is leading another team this October in the race. He is also volunteering to work for the Race for the Cure, creating awareness in malls and other public venues.

Mark is truly an asset to the community and to all who know him. Please consider giving Mark a fully probated sentence and no jail time. Mark is not a threat to society, in fact – he is very opposite. He has proven to be a model citizen in his commitment to volunteer work and making a difference in this world.

Sincerely,

Jill Hale
713.320.5014
jillchale@yahoo.com

# EXHIBIT I



# Church of Christ at Borger

### Patterned After The Holy Word

Hold fast the pattern of sound words which you have heard from me, in faith and love which are in Christ Jesus (2 Timothy 1:13).

PO Box 3364 ◘ Borger, TX 79008-3364 ◘ Phone (806) 274-6354 ◘ Fax (806) 274-6358

The Honorable Ellen Segal Huvelle                                    July 1, 2007
U. S. District Court for the District of Columbia
333 Constitution Ave., N. W.
Washington, DC 20001

Dear Judge Huvelle:

I am writing this letter on behalf of Mark Cross. My name is Wes Balentine and I have been a resident of Hutchinson County, Borger, Texas since 1979. During this period I have been active in city government, serving on the city council for eleven years. My professional background involved 31 years with J. M. Huber Corporation, working in several capacities. These included starting as a chemist, and in a later period worked as Plant Manager, Vice President of Manufacturing and Marketing Manager.

I have known Mark Cross since he was five years old. My association with him comes primarily from knowing him in the church. I have observed and admired his dedication and service in working with the youth group during his high school years. He was very active in church activities and served as a positive role model for the youth of the congregation. I am aware that during his attendance at a Christian college, Harding University, he continued his role of helping others by tutoring students.

I am also aware of his work performance with the State Department. Based on my limited knowledge of his job functions as Vice Consul, his success record appears to be above average.

The issue with his use of a diplomatic passport for personal use seems very out of character for Mark. He has acknowledged his error in judgment for not using his personal passport for his travel and accepts full responsibility.

I personally know that Mark expresses extreme regret. It is totally unlike Mark to intentionally do something that violates laws or ethical rules. Based on my personal knowledge of Mark's character, it is inconceivable this incident was any more than a lapse in judgment on his part at that point in time.

I have written letters on several occasions giving a testimony of character for acquaintances.  In Mark's case, it is very easy with a clear conscience to affirm his above average character and honesty.  I strongly believe he should receive full probation.  He is an asset to his profession and community.

Respectfully,

*Wes Balentine*

John W. "Wes" Balentine
227 Somerset Street
Borger, Texas 79007
Ph. 806 273 9833

# EXHIBIT J

June 24, 2007

Michelle Cross Dear

8617 Dallington Drive

Amarillo, Texas 79119

The Honorable Judge Ellen Segal Huvelle

U.S. District Court for the District of Columbia

333 Constitution Ave., N.W.

Washington, DC 20001

Dear Judge Huvelle:

I am writing you on behalf of my only brother, Mark Cross. Mark has pleaded guilty to a federal criminal offense arising from his misuse of a diplomatic passport. I understand you have a great deal of discretion as to the sentence which will be imposed for this offense, and I would like to give you some background information regarding Mark as you make this important decision.

It is difficult to convey to you the person that is Mark Cross in a letter. On the surface, Mark is your average "Joe." He goes to work each day, pays his taxes, goes to church, buys groceries, takes vacations, spends time with family and friends...but to anyone who knows him, he is so much more than that. He truly lives the life most Christian people try to live. Mark is a very kind and giving individual. He has been involved with several mission trips both here in the United States, as well as a seven week trip to Venezuela during college. He headed the law school chapter of Habitat for Humanity at the University of Houston. He was also the president of the Christian Legal Society. Immediately following Hurricane Katrina, he volunteered at the George R. Brown Facility and the Astrodome. He volunteers regularly with the Houston chapter of Susan G. Komen Race for the Cure. He is without a doubt a role model. I feel very blessed that he is a part of my life and the lives of my two children. If anything were to ever happen to my husband and me, Mark is the only person with whom I would want my children to live. He is a great brother, uncle, friend, and person.

Given that Mark is two years my junior, I have known him his entire life. When we were very young, he was the typical annoying little brother. It wasn't until we were both in high school, and I was able to witness him interacting with other people in a setting other than our

own home, that I truly began to admire and respect him. During his freshman year, I saw Mark begin to forge an internal strength, high moral character, and fortitude that is fully formed in the man whom you will see before you. Mark has always taken the high road. He never allowed peer pressure to get to him, he never drank nor would he have even thought of taking drugs. Mark was never too concerned with what others were doing or thinking about him, he chose to concentrate rather on staying true to himself, his own beliefs, and bettering himself. Though somewhat shy, I was amazed to see him speak his mind and stand up for what he believed to be right, even if it wasn't the "cool" thing to do. At that time, I looked up to the little brother who stood six inches shorter than me, for being so strong and always doing the right thing, when most teenagers, myself included, often did not. I have never looked up to him more than I do right now.

Once again, Mark has chosen to do the right thing. In many discussions with Mark regarding the misuse of a passport charge he is currently facing, I urged him to fight, to take the matter to trial. Mark stood firm that he would not go to trial. His simple reasoning was that he was indeed guilty of using a U.S. State Department passport for personal travel, no ifs, ands, or buts. When I asked Mark why he had used his diplomatic passport he said it was "stupid." Upon further sisterly prodding he told me that he already had a lot of stamps in that particular passport and thought he would add more, nothing more, nothing less. I could tell he was very embarrassed. I realize that to someone who has not known Mark long this answer most likely seems subpar and ridiculous. However, Mark has been fascinated with cities, places, and travel his entire life. At age four or five he had the entire Texas Almanac memorized, he could tell you the population and location of any city in Texas regardless of its size. When most teenagers had posters of rock bands or girls hanging on their walls, Mark had maps and the U.S. and Texas flags. I have no doubt in my mind that adding more stamps was all that crossed his mind when he grabbed his passport that day. Mark realizes he broke the law and has taken responsibility for his actions by pleading guilty.

Mark also made the decision to self-report his felony offense to the Texas State Bar. Because this offense lies outside the Texas jurisdiction, he was not required by the Disciplinary Board of the State Bar to do so. He is very concerned with how he will be judged by the Disciplinary Board, as this will impact both his current position and his ability to practice law in the State of Texas in the future. Mark has chosen to do this on his own, further taking responsibility for his actions.

Mark knows that his life will be forever changed because of his own actions. From this point forward, Mark will always have a felony on his record. This will affect virtually every aspect of his life. I believe Mark is most saddened by losing the ability to vote, travel, and adopt children. Mark is the only person I know who has never missed voting in any election since he turned eighteen. He truly feels voting is a privilege and has treated it as such, even voting in local city council runoff elections and voting while he was living overseas. As I stated earlier, travel has been a life long passion for Mark, and as I am sure you are aware, there are many countries which do not grant entry to convicted felons. Mark has always hoped to adopt children. After seeing him with my own children, I know Mark will one day be a wonderful father. I am not sure who I feel worse for, the child who will miss out on the father, or the father who will miss out on the child. Mark has been deeply affected by his actions, for which he has

taken full responsibility, and will continue to feel the sting of his carelessness in committing a felony for the rest of his life.

If it were possible for you to know Mark as well as his family, friends, and business associates, you would know that justice in this case, would be served by assessing the least possible punishment to Mark for this offense. The needs of society do not require more punishment, nor do the needs to rehabilitate an offender demand more than the minimum possible punishment. I know that Mark's future actions would never give you cause to regret such a decision.

Thank you for taking the time to read this letter, and thank you for your careful and deliberate contemplation of this matter.


Sincerely,

*Michelle Cross Dear*

Michelle Cross Dear

# EXHIBIT K

The Honorable Ellen Segal Huvelle
U.S. District Court for the District of Columbia
333 Constitution Avenue N.W.
Washington, DC 20001


Dear Judge Segal Huvelle,                                    June 26, 2007

    When my longtime friend, Mark Cross, sent me a lengthy update of the goings-on in his life, I settled in with a cup of coffee, full of excitement, to read his latest installment of the "life and times of Mark Cross," knowing I'd find out the new journeys and endeavors he's so accustomed to seek after and thoroughly experience.

    After reading a few lines, I realized this update wasn't like the others had been. I swiftly took the letter into the other room, with tears filling my eyes, and my husband looked at me and asked what was wrong. I said, "I'm in shock. I can't believe what I've read. It just doesn't make sense." The night dragged on and ended with both of our hearts aching and heavy for our dear friend, wishing when he awoke the next morning, the nightmare would've been just that, but the nightmare continued and escalated in the following days when he pled guilty to a felony. When I voiced my outrage and worry about the situation, I expected Mark to be full of anger and frustration alongside me, but he stayed true to form in how he took responsibility for his actions, never once blaming anyone but himself; he explained the reasons as to why he was in this situation and what the law states, and that at this point, we'd have to let the government follow the appropriate procedures. However, his devastation, embarrassment, sadness, and sheer frustration towards himself are very much alive and multiplying. I have continued to be impressed with Mark's character in refusing to blame anything or anyone besides himself and his own choices. He accepts his actions for making such a negligent mistake, and he is doing so with great humility, honor, and strength.

    I met Mark through a roommate who had grown up with him since childhood. I had just graduated from Baylor University in the spring of 2000 and moved to Houston, Texas, to begin my first job. Mark was in law school. We spared no time in getting to know the ins-and-outs of each others past, present, and future hopes. I was a bit dubious in knowing what it was I wanted to focus my life's intent on; Mark was the opposite. He'd known the path he wanted to walk since he was a child: to serve the United States in one form or another. I remember telling my mother how refreshing it was to find someone so young in age that had always known where they wanted to go and to see they were still so committed to their childhood dreams in the way Mark was.

    Mark is one of those unique friends that every one of his friends favors. He's the listener, the encourager, the adventurer, the dream chaser, the loyalist, the friend that forgives even when he shouldn't, the guy you call when you're in a terrible bind, the one that's always invited for dinner parties because it's just not the same if he's not there. He is intentional in loving God, his family, his friends, and his country. He gives of himself fully and freely to help others, even if he doesn't know you. I've always referred to him as a bleeding heart.

    For months I've been praying that you, the presiding judge, will mercifully grant Mark a fully probated sentence. I cannot fathom him not being allowed to practice law

and guide others through their experiences with the justice system.  To Mark, although, by his own admitted mistakes, has lost his job and some of his future plans, he has found great significance and purpose in practicing immigration law.  I plead for you to let him continue to serve his country and community with the same hope, diligence, and wherewithal he has carried with him as his childhood dreams have finally became his adulthood reality.

Respectfully,


Mrs. Whitney Carlstone
907 Woodmont Blvd.
Nashville, TN  37204

# EXHIBIT L

June 29, 2007

The Honorable Ellen Segal Huvelle
U.S. District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Your Honor,

I know that Mark Cross has been charged with a felony offense, and he accepts complete responsibility.

I have known Mark Cross since 1994. Since then, he has always been the epitome of integrity and responsibility, choosing to go the extra mile to make sure that his work, as well as his personal endeavors, are handled with excellence. Based on Mark's past conduct I am certain that Mark's mistake in this case was simply that: a one-time careless act that he horribly regrets.

Beginning in college, Mark's volunteer activities have established very personal ties to his community. He participated in numerous church-related campaigns, choosing to forfeit his vacation time to serve orphanages and homeless shelters, build houses, and host vacation bible school in a foreign country. Likewise, Mark has been heavily involved in Habitat for Humanity, participating every year while in law school, and even founding the chapter at the University of Houston.

Since beginning his law career, Mark has continued to be an asset in volunteering activities where he works. He was the first to foster an interest in recycling at his firm, and also coordinated the firm's first participation in the Susan G. Komen Race for the Cure. He also contributes to many noteworthy community-based organizations, such as the Susan G. Komen Race for the Cure/Breast Cancer Research, United Way Campaign, Houston Interfaith Ministries, the Salvation Army, Lakewood Church, and Impact Church.

If allowed to serve a fully probated sentence, not only would the City of Houston continue to benefit from Mark's generosity, but, pending the Texas Bar Association's decision, the Houston legal community would benefit as well.

Respectfully,

Rebekah E. Lowe

# EXHIBIT M

| Reminder: AOL will never ask you to send us your password or credit card number in an email. | This message has been scanned for known viruses. |
| --- | --- |

|  |  |
| --- | --- |
| **From:** | markscross@hotmail.com |
| **To:** | mark79007@aol.com, markscross75@aol.com |
| **Subject:** | FW: RE: DS Investigation - Mark Cross |
| **Date:** | Wed, 2 Feb 2005 7:26 PM |

>From: "Lunardi, Timothy J (Baghdad)" <LunardiTJ@state.gov>
>To: "Mark Cross" <markscross@hotmail.com>
>Subject: RE: DS Investigation - Mark Cross
>Date: Fri, 17 Dec 2004 17:47:39 +0300
>
>Mark,
>
>The investigation was closed over the Summer with no recommendation for criminal action against you
or any other party.  Thanks again for your cooperation and your willingness to speak with us.
>
>TJ Lunardi
>
>-------------------------------------------------------------------------
>TJ Lunardi
>A/RSO
>Regional Security Office
>U.S. Embassy - Baghdad, Iraq
>(914) 822-5660
>(0790) 181-8963
>
>
>
>-----Original Message-----
>From: Mark Cross [mailto:markscross@hotmail.com]
>Sent: Thursday, December 16, 2004 11:37 PM
>To: kirkmr@state.gov
>Cc: Lunardi, Timothy J (Baghdad)
>Subject: Re: DS Investigation - Mark Cross
>
>
>Mr. Kirk,
>
>I was just writing again to see if I could find out any information or status on the DS investigation on me
from back in April.  Also, I was curious if I could get back the diplomatic passport after it was cancelled.
>
>I sent an email a few weeks ago, but, not sure if it was ever received.  Any information is greatly
appreciated.
>
>Thanks again for your time.
>Sincerely,
>Mark Cross
>

# EXHIBIT N



See Instructions Before Completing

U.S. Department of State

## U.S. FOREIGN SERVICE EMPLOYEE EVALUATION REPORT

SUBMISSION CONTROL

| DATE RECEIVED IN POST/BUREAU (mm-dd-yyyy) 06-06-2002 | DATE RECEIVED IN HR/PE (mm-dd-yyyy) 06-06-2002 | DATE RELEASED TO DEPARTMENT FILES (mm-dd-yyyy) |
|---|---|---|

NAME OF EMPLOYEE BEING RATED (Last, First, MI)
Cross,  Mark        S.

| TYPE OF REPORT | GRADE FS-04 | SSN 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 |
|---|---|---|

REGULAR ☐  CAREER CANDIDATE ☒  VOLUNTARY ☐

INTERIM: Change of Rater ☐   Duties ☐   Assignment ☐

POSITION TITLE
Vice Consul

| POST OR ORGANIZATION Caracas | PERIOD COVERED (mm-dd-yyyy) From 06-06-2002      To    05-05-2003 |
|---|---|

| RATER Fredericka Schmadel      TITLE: Visa Chief      GRADE: FS-02 | REVIEWER FREDERICK B. COOK      TITLE Deputy Chief of Mission      GRADE FE-OC |
|---|---|

After careful review, I consider this report to be complete, in conformance with the instructions, and adequately documented by specific examples of performance.

A. *Fredericka Schmadel fhg 05-21-2003*
Rater's signature upon completion of  Section I, III, IV and V      Date (mm-dd-yyyy)

B. *[signature]*
Reviewer's signature upon completion of  Section VI

*1 May 2003*
Date (mm-dd-yyyy)

### I. CERTIFICATION – WORK REQUIREMENTS AND COUNSELING

Work requirements were established by rater, reviewer, and employee on (mm-dd-yyyy)     07-22-2002

If applicable, requirements were revised on  (mm-dd-yyyy)     _____

Employee's performance was discussed (candidate was counseled) on at least two dates as follows: (mm-dd-yyyy)

1.    07-22-2002        2.    10-24-2002        3.    11-01-2002        4.    03-15-2003

In the case of an unsatisfactory performance rating, this is also to certify that the requirements of 3  FAH-1 H-2814; 3 (tenured employees), 3FAH-1 H-2326 (employees subject to administrative promotion), or 3 FAM 2248 (FSO Career Candidates) have been met.

I certify that counseling sessions took place during the rating period and that at least one of them was documented in writing using the Counseling Certification Form (DS-1974).

*Fredericka Schmadel*
Rating Officer
*chg harder pelson*

*Mark S Cr*
Rated Employee

*10 May 2003*
Date (mm-dd-yyyy)

### II. REVIEW PANEL STATEMENT  (Completed by Review Panel)

A. Examples of Performance: Specific examples have been provided in all sections ☒ Yes (If not, return for rewrite.)
B. Certification: This report has been prepared according to the regulations and contains no inadmissible material.

5-21-2003
Date (mm-dd-yyyy)

ABELARDO A. ARIAS
Panel Chairperson's Name - Type

*Abelardo A. A.*
Signature

C. Comments: (If submitted late, indicate who is responsible for delay.)

When completed on Foreign Service personnel, this is an efficiency report which shall be subject to inspection only by those persons authorized by Sec. 604 of the Foreign Service Act of 1980.

EER FOR    Cross,, Mark S. 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   Rating Period From 06-06-2002 to 05-05-2003

## III. EMPLOYEE'S JOB AND WORK REQUIREMENTS (Established by Rater, Reviewer and Employee)

A. Describe the position and where it fits in the staffing pattern; indicate the number and kind of employees supervised or team affiliation(s) and tasking(s), whichever is applicable.

Incumbent is one of eight FSOs in the Consular Section and is supervised by the Chief of the Visa Branch. While the incumbent's primary responsibility is assisting in the processing of approximately 150,000 non-immigrant visas annually, to the extent possible, the incumbent will rotate among, and acquire experience in the operations of the three units of the section: Non-Immigrant Visas, Immigrant Visas, and American Citizen Serivces. The position requires rapid acquisition of knowledge of appropriate legal procedures, discretion, tact, and courtesy.

B. Divide work requirements into two categories: continuing responsibilities and specific objectives (including, as appropriate, professional development activities), listing these in descending priority order.

CONTINUING RESPONSIBILITIES FOR ALL OFFICERS:

-To promote U.S. interests and continued cordial bilateral relations by providing courteous and timely service to all consular clients;

-To determine the eligibility of applicants for all classes of non-immigrant visas through examination of documentary evidence and personal interviews;

-To share responsibility for management controls, including service in a scheduled rotation as the FSO responsible for accountable controlled equipment;

-To monitor procedures concerning how visa applications are received, processed, and adjudicated under the supervision of the Visa Branch Chief;

-To be alert to possible visa fraud and malfeasance;

-To be alert to ways to improve the overall efficiency of the section;

-To assist as needed with interviewing immigrant visa applications, or with providing other consular services;

-To provide services to imprisoned U.S. citizens as required by Department regulations;

-To ensure the proper handling and safeguarding of classified material and information.

SPECIFIC OBJECTIVES:

-To maintain current NIV interview rate of 100+ applicants per day;

-To serve in a scheduled rotation as Coupsters Officer, personally interview applicants who previously participated in the coups of 1992 and 1994, and send Security Advisory Opinions to the Department regarding each case;

-To serve in a scheduled rotation as Visas Vipers Officer, track names given by other departments to enter into the CLASS Lookout System, and send visas vipers cables to the Department listing names needed to be entered into the database;

-To serve in a scheduled rotation as Revocations Officer until November, review possible fraud cases or mistakes made in issuing visas, and revoke the visas from the applicants after they have been issued visas;

-To serve in a scheduled rotation as backup Immigrant Visas Officer;

-To periodically respond to Congressional inquiries in writing and by telephone;

-To serve periodically as Officer of the Week,

C. Describe any special circumstances influencing the work program.

Public uncertainty about the political and economic agenda of the current government of Venezuela has resulted in increased interest in and pressure for visas allowing long-term residence in the United States. At the same time, the events since 9/11/2001 in the U.S. have required officers to keep pace with security requirements imposed by the Department and U.S. Immigration. As a result, the consular officers must be more responsive and alert to visa flow changes and more attentive to possible fraud.

EER FOR   Cross,, Mark S. 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  Rating Period From  06-06-2002  to  05-05-2003

| IV. EVALUATION OF PERFORMANCE AND ACCOMPLISHMENTS (Completed by Rater) | | |
|---|---|---|
| ALL CLASSES | | |

| A. General Appraisal: | | YES | NO |
|---|---|---|---|
| 1.  All Employees: | Performance was satisfactory or better (If no, see instructions for documenting unsatisfactory performance) | ☒ | ☐ |
| 2.  SFS Members: | 1. Adjustment of Salary Level – Performance was excellent or better | ☐ | ☐ |
| | 2. Member is recommended for Performance Pay (see instructions) | ☐ | ☐ |
| | 3. Member is recommended for Recertification – Performance was excellent or better (See instructions for recertification, conditional recertification, and non-recertification criteria) | ☐ | ☐ |

**B. Discussion:**  Identify at least three of the work requirements including continuing responsibilities and/or specific objectives listed in Section III. For each, using examples, describe the employee's performance and accomplishments.

As a first-tour officer working in Embassy Caracas's Visa Branch, Mr. Cross's primary duty was to interview applicants for nonimmigrant visas (NIVs), both Venezuelans and third country nationals, and to decide their cases according to U.S. laws, the State Department's regulations, and this post's policies and procedures. Due to the tremendous changes taking place again and again in all of the previous areas, up to and including changes in the laws and in the application of the laws, Mark had to adjust to constant changes in the standards applied to his visa work. Notwithstanding, Mark's achievements are both remarkable and outstanding. For example, he decided nearly nine thousand visa cases in a four-month period, more than any other vice consul at this post. Mark not only decided cases in volume, he also handled our most sensitive cases, such as suspected money launderers, applicants with connections to organized crime, and past (along with possible future) conspirators or plotters scheming to overthrow the democratically elected government of Venezuela by force, both from the left and the right. Preserving a professional, but sympathetic demeanor, Mark elicited the whole story from the applicants, so that he could consider all the relevant information in deciding their cases.

One of three major portfolios Mark handled, in addition to devoting a full share of time and effort to general visa interviewing, was the Visas Viper portfolio, used to report the names and personal data of previously unknown terrorists to Washington. Writing classified cables at our post required Mark to go to another part of the Embassy and borrow computer equipment from a colleague. Processing and clearing Viper cables was also extremely labor-intensive. Mark handled a large number of such cables on extremely short notice, including one that provided the names of over 75 terrorists, with personal data, and another with 56 names. Mark's work in this area earned him two kudos cables from Washington.

Mark made several visits to U.S. citizens arrested or imprisoned in Venezuela. Over the past year, Mark has visited over twenty-five U.S. citizens imprisoned in both male and female prisons. He treats the prisoners with compassion and thoroughly explains U.S. laws and how the U.S. Embassy can assist them in their time of need. One prison visit even required Mark to be escorted and transported by Venezuelan national guard because of the prison's proximity to the Colombian border and guerilla controlled areas.

EER FOR   Cross,, Mark S. 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  Rating Period From  06-06-2002  to  05-05-2003

## V. EVALUATION OF POTENTIAL (Completed by Rater)

A. **For Career Candidates only:**  Assessment of career potential as a Foreign Service Officer or Foreign Service Specialist:
- ☐ Unable to assess potential from observations to date
- ☐ Candidate is unlikely to serve effectively even with additional experience
- ☐ Candidate is likely to serve effectively but judgement is contingent on additional evaluated experience
- ☒ Candidate is recommended for tenure and can be expected to serve successfully across a normal career span (see instructions)
  *(Support your choice by discussing below the candidate's potential for successful service across a normal career span, citing examples which illustrate strengths and weaknesses in each of the competencies cited below.)*

B. **For all Foreign Service employees:**  For each of the competency groups listed below, draw on specific examples of performance to describe the rated employee's potential for advancement in the Service. (See Core Precepts for definitions of competencies.)
   1. Leadership Skills   2. Managerial Skills   3. Interpersonal Skills   4. Communication and Foreign Language Skills
   5. Intellectual Skills   6. Substantive Knowledge

Leadership and Management – Mark is above all a leader and high achiever in terms of his operational effectiveness. In addition to a huge workload in general visa interviewing, Mark handled three other portfolios. Most vice consuls here handle only one. Recently, our revocations of visas quintupled because of a rise in fraud and a large number of people fleeing Venezuela. Mark took over revocations, writing a detailed legal rationale for each case, and informing Washington and the various ports of entry by cable. Part IV of this report lists Mark's accomplishments in handling the coupster and Visas Viper portfolios. He never fell behind, in spite of the enormous volume of work. Mark even used available working hours during Ordered Departure to reorganize the classified vault, purging old files and slimming our classified holdings. At my request, he took on the added task of reconciling three daily logs of visa foils used for printing visas or spoiled, to fit the report generated daily by the consular systems. The way he carried out this assignment showed initiative, problem-solving skills, and familiarity with the theory and practice of management controls.

Substantive Knowledge and Intellectual Skills – In a time of turmoil in Venezuela, with most normal activities of the country at a standstill due to a general strike, and most of Mark's colleagues gone on Ordered Departure, he took on the immense challenge of immigrant visas. We needed him and he came through successfully. There was a great amount of unfamiliar legal and regulatory material to absorb, and no time to prepare. With no previous experience with immigrant visas, Mark immediately was called to be the sole IV officer for over a two month period. This was a spectacular achievement. Mark's second crowning achievement was his discovery, starting from a routine NIV interview, of a huge alien smuggling ring based in Caracas, moving Ecuadorian children to an uncertain fate in the United States. Mark conducted the investigation, revoked 27 visas, wrote a detailed, masterful cable describing the scam and its operators, and coordinated appropriately with U.S. and host country authorities. For this accomplishment Mark received recognition from the Assistant Secretary of State for Consular Affairs. One of the highest achievers in a field of high achievers, the Foreign Service, Mark shows every sign of future success as an FSO at every level. The Department should tenure him immediately, and promote him as soon as possible thereafter.

Interpersonal, Communication, and Foreign Language Skills – Mark's generosity in consulting with and helping his colleagues is well known. For example, with his own innovation, he helped other officers understand the new Visas Condor requirements by creating a flow chart for their reference. In conducting our validation study to determine possible illegal-immigrants who used fraudulent information to obtain visas, Mark made sure it was value-neutral, not a blame game for the vice consul who may have issued the fraudulent visa, but rather research to help all of us doing visa work to improve our decisions. Mark has maintained excellent, professional, and mutually supportive relationships with his colleagues. His public speaking skills in English and Spanish were made known during the four days he worked at student fairs, making presentations and answering questions about visas for full-time study in the U.S. He also volunteered to participate in Caracas's Consular Corps and attended many diplomatic functions, not only our own, but representational events at eight other missions here.

EER FOR   Cross,, Mark S. 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   Rating Period From  06-06-2002  to  05-05-2003

**C.  Areas for Improvement:** The following must be completed for all employees. Employees should be made aware of areas where they should concentrate their efforts to improve. Specify at least one area in which he/she might best direct such efforts. Area(s) cited must be explicitly linked to one or more of the competency groups listed in Section V B and must have been discussed with the employee in counseling during the rating period. Justify your recommendation with examples and indicate below competency group(s) being addressed.
*(The response is not to be directed to need for formal training.)*

Specify Competency _____ Management _____ Specify Competency _____

Mark has shown he can do it all, and with spectacular results.  He should be more forthcoming with his supervisor, however, when his workload begins to reach the point of overload.  Although he has never fallen behind in his workload, he needs to let his supervisor know that the workload is very heavy, so that the supervisor can better delegate duties throughout the consular section.

## VI. REVIEW STATEMENT *(Completed by Reviewer)*

Assess the employee's performance and potential (if a career candidate, potential to serve across a normal career span–see instructions). Independent observations are encouraged and must be supported by additional examples of performance observed this rating period.  Note differences with the rater's appraisal or recommendations.  Comment on relations between rater and employee.

At one time during the Cold War, an American general speaking of the Soviet military observed that "Quantity has a quality all its own."  Mark Cross has produced such a prodigious quantity of work that one might be tempted to use this as the theme of his evaluation.  Except that Mark Cross has combined extraordinary quantity with outstanding quality.  And he has done it during a year of exceptional political turmoil, effectively proving that he is a strong candidate for immediate promotion and tenure.

Following the fall and restoration of the Chavez government in April 2002, Venezuela's political landscape changed forever – the government launched a major effort to assure that it could never be toppled again and the opposition launched an equal effort to force the government from power.  Hundreds of thousands took to the streets, again and again, both for and against the government.  The trade unions and business leaders led an unprecedented national work stoppage, paralyzing the country and leading to fatal violence.  US Government operations were hampered by a hostile host government and the staff reductions due to Ordered Departure.  The impact on the visa section, in both operations and adjudication, was dramatic.  Operationally, the Section was often closed and, when it was open, it was short staffed.  This created confusion among the applicants and demands for emergency appointments.  The cases themselves became much harder to adjudicate.  Applications that barely merited an interview a year ago became problematic as Venezuelans of all social strata began to overstay in the United States.  Similarly, the cases of some long time visa holders became extremely sensitive as it became known that some were possibly plotting actions against the Venezuelan Government.  So Mark was not only a Stakhanovite who processed some 18,000 nonimmigrant visa cases, he was also the first choice when the Consul General needed the utmost discretion to handle several politically sensitive cases.  The names cannot be used in an unclassified document, but I can attest personally to the quality and importance of these interviews.

Mark handled a large number of Visas Viper telegrams in a short time.  Some of these were monsters, one with 75 potential terrorists and another with 56.  He was twice commended by the Department for the quality of his reporting.  One secret to the quantity of Mark's output is the quality of his managerial abilities.  Mark developed or refined systems and procedures to work for, not against, him and his staff.  He worked with his FSN staff to review and revalidate certain previously issued visas, using techniques such as telephone calls to home or business numbers at random times.  Revocations quickly followed in the cases of applicants who had provided fraudulent information.  Similar he combined and organized three portfolios into one "Homeland Security" portfolio.  This now meant that one officer in rotation handled revocations, Viper cases, as well as applications by Venezuelan Government officials who participated in the 1992 coup attempt.  This proved to be most efficient as it kept one officer focused on these related themes.

EER FOR Cross,, Mark S. 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  Rating Period From  06-06-2002  to  05-05-2003

## VII. STATEMENT BY RATED EMPLOYEE

A. Discussion: This Section is intended to provide the rated employee's views on the period of performance appraised. You must comment on your most significant achievements during the period. You also may address any activities or problems not adequately covered in this report, or aspects of the appraisal which need clarification or correction. You are encouraged to state your current career goals including training and assignments desired over the next 5 years. (Continuation sheets may be used.)

Within the first year of consular work in Caracas, I learned and experienced much more than I thought was imaginable. What started as being a year to gradually learn the consular procedures in a mid-sized post, quickly turned into an extremely uphill learning curve that proved both highly beneficial and educational. Weeks after arriving at post, I was assigned three different consular portfolios because of short staffing. It was requested that I tackle all Visas Viper issues, revocations of visas, and personal interviews for applicants who were ineligible for having participated in coups. Previously, different officers handled all three portfolios. I was just "filling-in" until more officers arrived and could take some of the work overload. Instead of filling in, I found that all three areas were closely related and often dealt with similar procedures in the law. In step with the Mission Performance Plan and goals of the Department to promote national security, I created one combined "Homeland Security" portfolio. With this new plan, I was able to join related issues that threatened the United States, whether it was previous overthrowers of the Venezuelan Government or members of active terrorist groups targeting the U.S. This combination created an extremely important part of the consular function to protect the U.S. border. I frequently wrote classified cables and was in constant contacted with other agencies at post for information and guidance. On two different occasions, I received "praise" cables from the Department commending my good and efficient work regarding Visas Vipers.

In addition to this highly sensitive workload, in December post went to Ordered Departure and we were left with only 2 Junior Officers in the entire consular section. The Consul General selected me to serve as the Immigrant Visa officer. Immediately, I began interviewing all applicants for immigrant visas. During this uncertain time in Venezuela, there was a record number of applicants beginning the process to immigrate to the U.S. Alone with the assistance of one FSN, I sorted through the new and unfamiliar laws, forms, and regulations of immigration to efficiently assist this surge of applications. Meanwhile, I continued to keep up with the Homeland Security portfolio as well as become ready at a moment's notice to assist American citizens in the event of more political violence which threatened the 25,000 Americans living in Venezuela.

Although, I have gained additional and unexpected experience this past year, I have gained immeasurable experience from working on the NIV visa line. I interviewed over 18,000 non-immigrant visas applicants, more than any other officer at this post. Not only did I complete a large number of interviews, I also investigated each case with precision and accuracy. I have personally caught and entered over 90 visa overstays, 130 fraudulent documents, and over 45 fraudulent passports. During a routine visa interview, I uncovered an extensive alien smuggling ring operating out of New York and Caracas which brought Ecuadorian children illegally into the U.S. for slave-like employment. The numbers are uncertain, but post believes over 200 children were already smuggled into the U.S. By breaking up this ring, I uncovered 27 alien smugglers and revoked all of their visas. This daily interviewing victory caught both the eyes and ears of the Assistant Secretary of State for Consular Affairs as well as the Human Rights Watch for Venezuela.

B. I acknowledge receipt of this report:

Date Section VII Completed.  (mm-dd-yyyy)    10 May 2003            Employee's Signature

DS-1829

# EXHIBIT O



See Instructions Before Completing

U.S. Department of State

# U.S. FOREIGN SERVICE EMPLOYEE EVALUATION REPORT

## SUBMISSION CONTROL

| DATE RECEIVED IN POST/BUREAU *(mm-dd-yyyy)* | DATE RECEIVED IN HR/PE *(mm-dd-yyyy)* | DATE RELEASED TO DEPARTMENT FILES *(mm-dd-yyyy)* |
|---|---|---|
| 06-06-2002 | 06-06-2002 | |

NAME OF EMPLOYEE BEING RATED *(Last, First, MI)*

Cross          Mark          S.

| TYPE OF REPORT | | | GRADE | SSN |
|---|---|---|---|---|
| REGULAR ☐    CAREER CANDIDATE ☐    VOLUNTARY ☐ | | | fs-04 | 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 |
| INTERIM:  Change of Rater ☒    Duties ☐    Assignment ☐ | | POSITION TITLE<br>Vice Consul | | |

| POST OR ORGANIZATION | PERIOD COVERED *(mm-dd-yyyy)* | |
|---|---|---|
| | From    04-15-2003 | To    08-22-2003 |

| RATER   Jill A. Nystrom | REVIEWER   Charles S. Shapiro |
|---|---|
| TITLE:   Acting Consul General          GRADE:  FS-03 | TITLE:  Ambassador          GRADE:  FE-MC |

After careful review, I consider this report to be complete, in conformance with the instructions, and adequately documented by specific examples of performance.

A. *Rater's signature upon completion of Sections I, III, IV, and V*    08/21/2003    *Date (mm-dd-yyyy)*

B. *Reviewer's signature upon completion of Section VI*    24 Sept 03    *Date (mm-dd-yyyy)*

## I. CERTIFICATION - WORK REQUIREMENTS AND COUNSELING

Work requirements were established by rater, reviewer, and employee on *(mm-dd-yyyy)*    04-15-2003

If applicable, requirements were revised on *(mm-dd-yyyy)* _____

Employee's performance was discussed (candidate was counseled) on at least two dates as follows: *(mm-dd-yyyy)*

1.    07-18-2003    2.    08-04-2003    3. _____    4. _____

In the case of an unsatisfactory performance rating, this is also to certify that the requirements of 3 FAH-1 H-2814.3 *(tenured employees)*, 3 FAH-1 H-2326 *(employees subject to administrative promotion)*, or 3 FAM 2248 *(FSO Career Candidates)* have been met.

*I certify that counseling sessions took place during the rating period and that at least one of them was documented in writing using the Counseling Certification Form (DS-1974).*

_____ Rating Officer    _____ Rated Employee    _____ Date *(mm-dd-yyyy)*

## II. REVIEW PANEL STATEMENT *(Completed by Review Panel)*

A. Examples of Performance: Specific examples have been provided in all sections ☐ Yes *(If not, return for rewrite)*

B. Certification: This report has been prepared according to the regulations and contains no inadmissible material.

_____ Date *(mm-dd-yyyy)*    _____ Panel Chairperson's Name - Type    _____ Signature

C. Comments: *(If submitted late, indicate who is responsible for delay.)*

When completed on Foreign Service personnel, this is an efficiency report which shall be subject to inspection only by those persons authorized by Sec. 604 of the Foreign Service Act of 1980.

EER FOR Cross, Mark S. 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 Rating Period From 04-15-2003 to 08-22-2003

| III.  EMPLOYEE'S JOB AND WORK REQUIREMENTS (Established by Rater, Reviewer and Employee) |

A.  Describe the position and where it fits in the staffing pattern; indicate the number and kind of employees supervised or team affiliation(s) and tasking(s), whichever is applicable.

Incumbent, one of eleven consular officers in Caracas, reports to the Visa Branch Chief.  While the incumbent's primary responsibility is to participate in a team of officers processing approximately 140,000 non-immigrant visas annually, if possible, the incumbent will rotate among and acquire experience in operations of the three units of the section: Non-immigrant Visas, Immigrant Visas, and American Citizens' Services.  Incumbent must acquire knowledge of appropriate legal procedures, discretion, tact, and courtesy.

B.  Divide work requirements into two categories: continuing responsibilities and specific objectives (including, as appropriate, professional development activities), listing these in descending priority order.

CONTINUING RESPONSIBLITIES
-Promote U.S. interests and continued cordial relations by providing courteous and efficient service to all consular clients;
-Interview applicants for all classes of non-immigrant visas and decide their cases to completion;
-Coordinate procedures and visa workflow, with due consideration for cultural and political factors and FSN career development;
-Watch for fraud and deception and encourage team members to do the same;
-Provide service to U.S. citizens arrested, imprisoned, or on trial as required by Department regulations;
-Ensure the proper handling and safeguarding of classified and accountable material and information;
-Assist in responding to Congressional and other inquiries.

SPECIFIC OBJECTIVES
-Serve in a scheduled rotation as NIV Line Coordinator, working to achieve efficiency, consistency, fairness, politeness, and cultural sensitivity with collegues and the public;
-Serve as Acting Visa Branch Chief;-Serve as backup for the ACS Officer;
-Reconcile NIV foils on a daily and continuous basis, according to the Standard Operating Procedures;
-Decide visas for religious workers, whether immigrant or non-immigrant;
-Update the NIV Standard Operating Procedures as necessary.
-Coordinate with Consular Affairs and a local Venezuelan bank to set up the installation of a new computerized telephone appointment system and MRV payment system for all NIV appointments.

C. Describe any special circumstances influencing the work program.

Political turmoil, the spiraling downturn in economic activity, a two-month long work stoppage, high inflation and high unemployment have led to increased pressure for non-immigrant and immigrant visas to the United States.  As a result, the consular section must be alert to the quickly changing economy and increased fraud.  New non-immigrant visa procedures have more than doubled the time required to process a visa case.  The rating period included one ordered and two authorized departure periods.

EER FOR  Cross, Mark S. 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  Rating Period From  04-15-2003  to  08-22-2003

| IV. EVALUATION OF PERFORMANCE AND ACCOMPLISHMENTS (Completed by Rater) ALL CLASSES | | |
|---|---|---|

A. General Appraisal:

| | | YES | NO |
|---|---|---|---|
| 1. | All Employees: Performance was satisfactory or better (If no, see instructions for documenting unsatisfactory performance) | ☒ | ☒ |
| 2. | SFS Members:  1. Adjustment of Salary Level – Performance was excellent or better | ☐ | ☐ |
| | 2. Member is recommended for Performance Pay (see instructions) | ☐ | ☐ |
| | 3. Member is recommended for Recertification – Performance was excellent or better (See instructions for recertification, conditional recertification, and non-recertification criteria) | ☐ | ☐ |

B. Discussion:  Identify at least three of the work requirements including continuing responsibilities and/or specific objectives listed in Section III. For each, using examples, describe the employee's performance and accomplishments:

Mark Cross led productivity as a member of the non-immigrant visa (NIV) interviewing team during this rating period.  He adjudicated over 22 percent of the total workload.  His comportment with the public was excellent.

Mark also coordinated with Consular Affairs in the Department of State and with a local Venezuelan bank to organize the installation of a new computerized telephone appointment system and payment system for NIV applicants.  The prior structure of paying for and scheduling interviews was cumbersome for the applicants.  It also increased the workload of both officers and FSNs when special appointments needed to be arranged.  The new system should create more efficiency in payment and scheduling.

Regrettably, Mark's performance this rating period was significantly marred by continuous inappropriate decisions about NIV issuances.  On one occasion, he issued a full-validity visa to a personal friend, outside of normal consular hours and outside of normal protocols.  Consular officers are instructed to pass all cases with which they have a personal connection to another officer, to avoid even the appearance of misconduct.  Mark was counseled by the then-Consul General and Acting Deputy Chief of Mission after this issuance was discovered.

Another officer later discovered that Mark had issued an NIV to an applicant over a class 1 hit without following proper fingerprinting and clearance procedures.  Mark issued this visa in May, and the issuance was discovered later when the same applicant returned to post to apply for an immigrant visa.  The officer noted that the hold had not been cleared.  Mark was counseled by the Acting Visa Chief upon this discovery on or about July 14.  The Acting Visa Chief reminded him of the correct procedures for issuing visas to applicants with class hits.  Mark agreed that he had exercised poor judgment and that he would be more careful in the future.  The Acting Visa Chief brought up these requirements again on July 15 at the consular officer staff meeting.

Mark once again issued an NIV over a class1 hit without following proper fingerprinting and clearance procedures on July 18.  The incorrect issuance was discovered by a U.S. immigration officer when the applicant attempted to enter the U.S. with unresolved hits in the system.  Post was notified on July 25.  As Acting Consul General, I was notified of these issuances on July 31.  The following day, August 1,  yet another U.S. immigration officer called post to inform us that a visa had been improperly issued over a class 2 hit for an I-275, the U.S. immigration service's record of refusing entry to a non-citizen.  Despite this hold in the system, Mark had issued the applicant a visa without clearing it first.

Mark's actions clearly violate the consular section's mandate to promote U.S. interests, in particular our need to protect U.S. borders and U.S. national security.  Despite his strengths in other areas, I can not recommend tenure at this time.

EER FOR    Cross, Mark S. 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    Rating Period From 04-15-2003 to 08-22-2003

## V. EVALUATION OF POTENTIAL (Completed by Rater)

**A.  For Career Candidates only:**  Assessment of career potential as a Foreign Service Officer or Foreign Service Specialist:

☐  Unable to assess potential from observations to date

☒  Candidate is unlikely to serve effectively even with additional experience

☐  Candidate is likely to serve effectively but judgement is contingent on additional evaluated experience.

☐  Candidate is recommended for tenure and can be expected to serve successfully across a normal career span (see instructions)
*(Support your choice by discussing below the candidate's potential for successful service across a normal career span, citing examples which illustrate strengths and weaknesses in each of the competencies cited below.)*

**B.  For all Foreign Service employees:**  For each of the competency groups listed below, draw on specific examples of performance to describe the rated employee's potential for advancement in the Service. (See Core Precepts for definitions of competencies.)
1. Leadership Skills   2. Managerial Skills   3. Interpersonal Skills   4. Communication and Foreign Language Skills
5. Intellectual Skills   6. Substantive Knowledge

Mark Cross's interpersonal skills are excellent. During this rating period, and indeed his entire tour, he has been highly regarded by officers and FSNs alike. He has demonstrated patience with new hires, training four new officers during his time as non-immigrant visa (NIV) line coordinator. He reviewed and assisted with all training activities for these officers, guiding them through the first several weeks of interviewing. He has a solid command of Spanish, conducting interviews rapidly.

Mark showed management ability in his coordination of the hiring of 4 FSN summer hires and 2 U.S. family member summer hires. He also worked with the senior NIV FSN to improve FSN management and workflow. He initiated regular meetings to discuss areas for improvement and to praise the processes that were working well. Additionally, he worked to ensure the arrival of an emergency supply of Lincoln visa foils after post had been shipped the old style Teslin visas. His ability to resolve this shortage problem quickly meant that post did not miss any interviewing days and did not fall farther behind in schedule. He also began a pre-screening rotation of all applicants, which allows officers to interview 25 percent more applicants daily. Mark's substantive knowledge of the regulations governing visas, along with his amiable nature, made him a resource for both officers and FSNs who were having difficulty interpreting the law. He worked with the Acting DCM and Acting Consul General to streamline and change requirements for personal interviews as mandated by changes in departmental policy. He developed a quick-reference chart for the NIV officers, which made it easier to discern whether an applicant needed to come to the Embassy for an interview. Mark also created the Visa Condor requirements chart, which allows officers to rapidly determine whether an applicant needs to be referred to the Department for a security advisory opinion.

Mark's obvious intelligence, substantive knowledge and management skills make it difficult to understand the egregious errors he has made during this rating period with reference to issuing visas over class 1 and 2 hits without going through proper processing and consultations. His sensitivity to the demands for security and accountability by Consular Officers, particularly in the wake of the September 11 terrorist attacks, also challenge one's understanding of how so many improper decisions could have been made during such a critical time for the United States and the consular cone.

Mark has been willing to work hard and make every effort to assist his colleagues and subordinates. However, his judgment with regard to our most critical concerns is in question. At this time, he cannot be recommended for tenure.

EER FOR   Cross, Mark S. 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   Rating Period From  04-15-2003  to  08-22-2003

**C.  Areas for Improvement:** The following must be completed for all employees.  Employees should be made aware of areas  where they should concentrate their efforts to improve.  Specify at least one area in which he/she might best direct such efforts.  Area(s) cited must be explicitly linked to one or more of the competency groups listed in Section V B and must have been discussed with the employee in counseling during the rating period. Justify your recommendation with examples and indicate below competency group(s) being addressed.
*(The response is not to be directed to need for formal training.)*

Specify Competency _____ Managerial Skills _____   Specify Competency _____ Leadership Skills

Mark has shown serious lapses in judgment during his visa adjudications this rating period.  He has been removed from interviewing duties in all areas of the consular section. Mark must improve his judgment and his ability to follow correct procedures in order to preserve the integrity of the consular function and U.S. national security itself.

## VI. REVIEW STATEMENT *(Completed by Reviewer)*

Assess the employee's performance and potential (if a career candidate, potential to serve across a normal career span-see instructions). Independent observations are encouraged and must be supported by additional examples of performance observed this rating period. Note differences with the rater's appraisal or recommendations.  Comment on relations between rater and employee.

I ordinarily would not review the EER of a junior officer, but both the Consul General and the DCM arrived only at the very end of the rating period.

Mark Cross is a bright officer who is well liked by his peers both in the Consular Section and throughout the Embassy generally.  He even served as chairman of the junior officer association.  His relations with the Consul General who departed post in July were excellent as was his relationship with the rating officer.  He has been a key player in the consular section who accepted de facto leadership when the NIC chief departed post in February and a WAE temporary replacement arrived in June.  As the rating officer pointed out, Mark adjudicated more than 20 percent of all NIV applications -- the largest percentage of any officer.

Speed and productivity cannot become excuses for sloppy work or poor judgment.  I have reviewed the three cases in which Mark overrode class 1 and class 2 hits and find them inexplicable.  While false hits -- for example, hits with applicants with similar names but different nationalities and different dates of birth are common -- each of these three was an exact hit.  The same names, Venezuelan nationality, and the same dates of birth.  When I asked Mark for an explination of what happened, he could offer no excuse but realized the gravity of these oversights and expressed concern for the potential consequences to U.S. security.

I do not recommend that Mark Cross be granted tenure at this time.

DS-1829                                                                                                    Page 5 of 6

EER FOR Cross, , Mark S. 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  Rating Period From  05-06-2003  to  08-22-2003

| VII. STATEMENT BY RATED EMPLOYEE |
|---|

A. Discussion: This Section is intended to provide the rated employee's views on the period of performance appraised. You must comment on your most significant achievements during the period. You also may address any activities or problems not adequately covered in this report, or aspects of the appraisal which need clarification or correction. You are encouraged to state your current career goals including training and assignments desired over the next 5 years. *(Continuation sheets may be used.)*

I acknowledge that I received the evaluation report; however, at the current time I decline to make further statement.

B.  I acknowledge receipt of this report.

Date Section VII Completed.  *(mm-dd-yyyy)*   10-9-2003

Employee's Signature

DS-1829